MILTON PEVELER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peveler v. Commissioner
Docket No. 6308-77.
United States Tax Court
T.C. Memo 1979-460; 1979 Tax Ct. Memo LEXIS 66; 39 T.C.M. (CCH) 502; T.C.M. (RIA) 79460; November 20, 1979, Filed *66 Petitioner and his wife were divorced in June of 1972 but continued to live together thereafter. Held, petitioner and his wife were not entitled to file a joint return for 1972. Petitioner sold an 831-acre tract of land in 1972. On his original return for 1972 petitioner reported his basis in the property as $4,198. In his petition petitioner claimed that he inherited the property from his father in 1947 and that his basis in the property was one-half of the fair market value of the property at the time of his father's death, or $24,980. Held, petitioner failed to carry his burden of proving that he inherited the property from his father and that his basis in the property was greater than the $4,198 allowed by respondent. Burton H. Gilbert, for the petitioner. William P. Hardeman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND *68 OPINION DRENNEN, Judge: Respondent determined a deficiency of $5,334.05 in petitioner's 1972 Federal income tax. The petitioner not only challenges the deficiency but claims an overpayment of $1,313.25. The issues presented are: (1) Whether petitioner is entitled to file a joint income tax return for 1972; and (2) whether petitioner acquired by inheritance his interest in 831 acres of farmland in Hood County, Tex., which he sold in 1972, and if so, the value of the property in 1947 when he claims to have inherited it. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Milton E. Peveler (hereinafter petitioner) resided in Fort Worth, Tex., on the date he filed his petition in this case. Joint Return
Petitioner timely filed a Federal income tax return for 1972 with the Internal Revenue Service Center at Austin, Tex. On this return he claimed a filing status of "single." Orita Peveler (hereinafter Orita), petitioner's second wife, also filed an individual income tax return for 1972 reflecting filing status as "single." Petitioner signed Orita's *69 return as the return preparer. At the bottom edge of Orita's tax return, a mark was made through the instruction that both husband and wife must sign the return if filing jointly. Petitioner filed an amended return for 1972 on February 12, 1975, on which he again claimed filing status of "single." [1] Petitioner filed a second amended return for 1972 on April 12, 1976, on which he claimed a refund of $1,041. The purpose of this amended return was to change petitioner's filing status from "single" to "married filing jointly." The return states the "change [was] to include common law wife on Joint Return." Both petitioner and Orita signed this return. Petitioner was married to Floy F. Peveler on November 6, 1931. They were divorced sometime in 1955. Petitioner and Orita were married on November 2, 1955, and they were divorced several years later. Following this divorce petitioner and Orita, except for a short period, continued to live together. Petitioner and *70 Orita were ceremonially remarried on March 31, 1967. This marriage was terminated by divorce on June 23, 1972. Orita filed for the divorce ultimately granted on June 23, 1972, without petitioner's knowledge. Petitioner did not know why Orita filed, and Orita did not testify. At some point prior to June 23, Orita, taking only her clothing, moved out of the house she shared with petitioner and moved in with her son. Subsequent thereto, but prior to June 23, Orita returned and lived together with petitioner. On June 23 petitioner drove Orita to the courthouse where the divorce was granted. Afterward, petitioner and Orita drove home and continued to live together. When petitioner was asked at trial whether he and Orita had agreed to live together as husband and wife following the divorce, he replied "No, we just went back home and did." There was no division of community property following the divorce. Petitioner continued to pay all Orita's expenses. Orita's health began to fail about the middle of 1972. She experienced trouble walking and seeing. Those troubles have increased during the ensuing years. Petitioner and Orita apparently did not tell many, if any, of their *71 friends or neighbors about the June 1972 divorce. Since they continued to live together, most people thought they were still husband and wife and treated them as such. Following the divorce petitioner and Orita considered being ceremonially remarried, but they did not do so because, in petitioner's words, they had "had so many before * * * [they] thought maybe * * * [they had] had enough." On August 9, 1976, petitioner and Orita sent a letter to the Social Security Administration requesting that their original applications for retirement benefits as single persons be reviewed in light of the fact that they had continuously lived together as "husband and wife" since 1967. By letter dated November 22, 1976, the Social Security Administration sent Orita an Award Certificate which recited that her benefits included, inter alia, those of a wife. Petitioner and Orita have received Social Security benefits as husband and wife. In the notice of deficiency for 1972 issued to petitioner, respondent computed the deficiency on the basis that petitioner was filing his return as a single person. He contends that petitioner and Orita were not common-law husband and wife as of the *72 end of 1972 and, therefore, were not entitled to file a joint return for that year. Farmland
On September 20, 1933, a warranty deed was executed which conveyed to petitioner legal title to a tract of farmland in Hood County, Tex., consisting of 622 acres. Petitioner bid on the farmland after the Federal Land Bank of Houston had obtained it as a result of foreclosure proceedings. Petitioner paid $1,025 and assumed liability for the $3,350.93 balance due on a promissory note of $4,000 which was payable to te Federal Land Bank. This note was secured by a first lien on the farmland. On August 8, 1936, petitioner and his then wife, Floy F. Peveler, conveyed by warranty deed the 622 acres to petitioner's father, Charles Peveler, for $1,000 and Charles Peveler's assumption of the liability for payment of the $3,351.13 balance due on the promissory note payable to the Federal Land Bank. [2]
On January 7, 1937, Charles Peveler purchased a tract of farmland in Hood County, Tex., consisting of 209 acres. This tract adjoined *73 the 622-acre tract (hereinafter these two tracts will be considered as one 831-acre tract and will be referred to as the farmland). Petitioner and Floy Peveler lived on and farmed the farmland until approximately 1940. During this period they paid rent to petitioner's father. Petitioner did not live on the farmland after 1940. At no time did petitioner's father live on the farmland. After 1940 the farmland was generally used as grazing land. Petitioner's father received rental income by leasing it as grazing land, and he paid the property taxes on the farmland. After 1947 petitioner received the rental income. State and county taxes for the farmland were paid in 1947 and 1948 by petitioner. The 1947 taxes were not paid until 1948. The receipts for both years were issued in the name of petitioner's father. Petitioner's father died testate on December 14, 1947, leaving a holographic will written a short time before his death. The holographic will contained the following provisions, among others: Second: After the payment of such funeral expenses and debts, I give, devise and bequeath, unto my beloved wife O.P. all the property, real and personal, and effects of every *74 name and nature which I now have, may die possessed of, or may be entitled to, her heirs and assigns forever. * * *
Fourth. It is my will and desire that my wife O.P use as much of my property, both income and principal, as may be required to provide her needs so long as she may live, and the remainder, if any, be divided equally between my Daughter Mrs. Mabel H. of D-Tex., and my Son M.P. - of Ft. Worth. The following statement was made with respect to the farmland here involved: The arrangement of the property on Squaw Creek is like this: In several different ways I have put $8,000.00 into the property * * *. The understanding is like this--I have $8,000.00 in the place, Milton P. owns the balance. The property is all in my name, but that is for security purposes only. If I should die before my wife O.P. I give to her all my interest in this property. If this property is not sold during the lifetime of my wife O.P., Milton P. is to pay her Four per cent per annum on this $8,000.00 and as much of the principal as she may need to pay her living expenses; or until it is all paid to her, and when all of this $8,000.00 is paid to her, the property is to belong to Milton *75 P. If this property is sold during my lifetime or during the lifetime of my wife, then myself or my wife is to be paid this $8,000.00 and Milton P. is to have the balance of whatever the same may bring. If this $8,000.00 is not paid to me or my wife during the lifetime of either of us, then Milton P. is to pay to his sister, Mrs. Mable Hexter, one-half of the above said $8,000.00 the other one-half of this $8,000.00 and the property is his. In the inventory and appraisement of petitioner's father's estate, executed on March 14, 1949, neither the farmland nor the $8,000 interest therein was mentioned. [3] Other real property located in Hood County was listed on the inventory. Petitioner was not involved in inventorying his father's estate and he did not know why mention of the farmland was omitted from the inventory. *76 Also on March 14, 1949, petitioner's mother, independently and as executrix of petitioner's father's will and estate, in consideration for $8,000 "secured to be paid, by" petitioner's vendors lien note in the principal sum of $8,000, conveyed to petitioner by warranty deed the farmland. The principal sum was payable to petitioner's mother on or before 10 years after that date and interest was payable at 4 percent per annum, beginning on March 14, 1950. This warranty deed was recorded on May 18, 1949. [4] On May 24, 1949, petitioner's sister and her husband, in consideration for $1, quitclaimed to petitioner any interest they may have had in the farmland. The Federal Land Bank requested that petitioner obtain a quitclaim for the purpose of clearing title. This quitclaim was recorded on June 2, 1949. Petitioner gave his mother a note, secured by a deed of trust on the farmland, dated March 14, 1949, in the amount of $8,000 and made regular payments of interest to her in the amount of $320 pe annum until her death. Petitioner's mother died in 1953 or *77 1954. The inventory and appraisement of her estate was executed on September 7, 1954, and it lists the $8,000 note payable by petitioner as an asset. [5]
In 1955 Floy F. Peveler filed a petition for divorce from petitioner in which it was stated that the parties were married on November 6, 1931, that the farmland was owned as community property, and that it was acquired by them "after marriage with their common funds and was not acquired by either of them by means of separate estate, gift, devise, or descent." The divorce petition also states that petitioner owned as separate property a one-half undivided interest in the estate of his mother. In August 1955 Floy F. Peveler and petitioner executed a property settlement agreement in connection with the divorce proceedings. The agreement provided that each party was to retain his undivided one-half interest in and to the farmland and to hold said land as his individual *78 separate property. In connection with the property settlement agreement, on October 28, 1955, petitioner and Floy Peveler each conveyed to the other by warranty deed an undivided one-half interest in the farmland as sole and separate property. In 1972 petitioner sold his undivided one-half interest in the farmland under threat of condemnation. He received $124,391. Included with petitioner's original return for 1972 was a handwritten attachment in which it was stated that petitioner had sold farmland under threat of condemnation for $124,391, that petitioner had a "cost of $4,198 in the property," and that petitioner elected to defer the gain from the sale of the property pending reinvestment within the period provided by law. No gain was reported as income. Petitioner filed his first amended return for 1972 on February 12, 1975, the purpose of which was to report the gain from the sale of the farmland. It was reported as follows: Long term gain deferred in 1972
return ($124,391 - $4,198)
$120,193
Less additional basis: [6]
8,189
112,004
Adjusted deferred gain $112,004
Gross sales price 124,391 90 percent
Petitioner purchased a residence
in 1973 for $14,454
$ 14,454
Reduction in basis: 90% X $14,454
13,009
Adjusted basis in residence
1,445
Adjusted gain from farm property
112,004
Portion of gain which reduced
basis in residence
13,009
Long term capital gain
98,995
1/2 excludable
49,498
1/2 taxable
49,497
*79 In a letter dated November 12, 1975, sent to the Internal Revenue Service protesting the determination that petitioner had only a basis of $4,198 in the farmland, petitioner explained the claimed total basis of $12,387 ($4,198 plus $8,189) as follows: 1/2 inherited at the time of my
1/2 my part
father's death at $50 acre
$20,775
$10,387
1/2 from my mother
4,000
2,000
$12,387
The letter also protested the determination that petitioner's investment in a residence did not meet the similar or related use requirement so as to allow for the deferral of gain. Petitioner has conceded this point before this Court. On his second amended return for 1972 filed in 1976, petitioner reported the gain on the sale of his one-half interest in the farmland in the same manner it was reported on the first amended return. The purpose of the second amended return was to make the return a joint return. In his petition, however, petitioner claimed that he *80 inherited 100 percent of the farmland from his father, that the value of the property at that time was $49,960 ( $60 per acre), and that his basis in the one-half interest in the property he sold in 1972 was $24,980. In the statutory notice of deficiency, respondent determined that petitioner only had a basis of $4,198 in the farmland, the amount claimed on petitioner's original return for 1972. Valuation
To establish the fair market value of the farmland on December 14, 1947, the date of petitioner's father's death, petitioner and respondent each presented the testimony of witnesses, Albert Porter for petitioner, and Bryan Wilkinson for respondent. Petitioner's witness, Albert Porter, is a resident of Hood County and was County and District Clerk of Hood County from 1936 until January 1949. Since that time he has worked as a real estate broker and in the abstract and title business. He also owned a farm in Hood County. He was not, however, professionally qualified as a real estate appraiser, although he did perform appraisals, doing so both because of friendship and because he was hired. Porter was familiar with both land values in Hood County in 1947 and the *81 farmland. Porter also knew petitioner's father and had discussions with him concerning the value of the farmland and of other land, which other land was for sale at that time. In 1977 Porter prepared an appraisal of the farmland at petitioner's request to determine its value as of December 1947. It was Porter's opinion that the farmland was $60worth per acre. This opinion was based upon Porter's familiarity with the land as it existed in 1947, his knowledge of land values in Hood County, and his investigation of records of the sales in 1947 of other land. Porter believed that the farmland was one of the better farms in the county for grassland. Respondent's witness, Bryan Wilkinson, has been employed since 1961 by the Internal Revenue Service as an engineer. He possesses a Bachelor of Science Degree in engineering, has taken a series of real estate appraisal courses, and has taught real estate appraisal courses both at the university level and to Internal Revenue Service personnel. Wilkinson has appraised both real estate and person property. In 1978 Wilkinson prepared an appraisal report to establish the value of the farmland as of December 1947. Wilkinson had not seen *82 the land prior to 1978. It was Wilkinson's opinion that the farmland had a value $40of per acre on December 14, 1947. This opinion was based on an analysis of recorded land sales of comparable property in Hood County between late 1946 and early 1948. Wilkinson considered the farmland to be below average in Hood County. OPOINION Joint Return
Section 6013(a), I.R.C. 1954, [7] provides that a husband and wife may make a single return jointly of income taxes. A joint return can be filed notwithstanding that separate returns were initially filed for the taxable year. Sec. 6013(b). For purposes of section 6013, the status of two individuals as husband and wife shall be determined as of the close of the taxable year. Sec. 6013(d)(1)(A). The marital status of two individuals for purposes of determining their eligibility to file a joint return is to be determined under the laws of the State of their residence. vine Tersch v. Commissioner,47 T.C. 415, 419 (1967). See Rev. Rul. 58-66, 1958-1 C.B. 60. *83 Both petitioner and Orita were residents of Texas during 1972 and the State of Texas recognizes common-law marriages. Tex. Code Ann., Family Code, sec. 1.91 (Vernon 1975). Thus, notwithstanding that petitioner and Orita were divorced on June 23, 1972, and not ceremonially remarried during 1972, if, as of the last day of 1972, by operation of Family Code sec. 1.91 they were married, then they were entitled to file a joint return. Texas Family Code Ann., sec. 1.91, provides, in pertinent part: (a) In any judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that: * * *
(2) they agreed to be married, and after the agreement they lived together in this state as husband and wife and they are represented to others that they were married. (b) In any proceeding in which a marriage is to be proved under Subsection (a)(2) of this section, the agreement of the parties to marry may be inferred if it is proved that they lived together as husband and wife and represented to others that they were married. Each of the three elements, (1) an agreement presently to be husband and wife, (2) living together pursuant to the agreement and *84 cohabitation as husband and wife, and (3) a holding-out of each other as husband and wife is necessary, "and it is particularly essential that the parties mutually agree that they would then and thenceforth be husband and wife and that the following cohabitation be on the faith of this mutual agreement and promise." Gary v. Gary,490 S.W. 2d 929, 932 (Civ. App. Tex. 1973). All three of the required elements must be present together. The mutual agreement need not be expressed. It is sufficient if the agreement can be inferred or implied from the cohabitation and the holding out as husband and wife. Gary v. Gary,supra at 932; Family Code, sec. 1.91(b). Petitioner asserts that the three elements necessary for the creation of a marriage pursuant to Family Code sec. 1.91 were present in 1972 when petitioner and Orita continued living together following the 1972 divorce as if no divorce had taken place. Furthermore, petitioner makes the argument that it would be inconsistent for this Court not to conclude that petitioner and Orita were husband and wife in 1972 when the Social Security Administration determined on the same facts, although in a *85 different year (1976), that petitioner and Orita were entitled to benefits as husband and wife. We do not agree with either of petitioner's points and, therefore, hold for respondent. Petitioner has the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure. The evidence presented does not establish the existence of a mutual agreement between petitioner and Orita to be husband and wife. There was no express mutual agreement. Petitioner, when asked if he and Orita had expressly agreed to live together as husband and wife following the divorce, replied "No, we just went back home and did." Orita did not testify. Petitioner would have us infer the existence of a mutual agreement from the parties living together and their holding themselves out as husband and wife. Although Texas Family Code section 1.91 allows such an inference to be made, it "can not be drawn from circumstances contrary to the direct testimony of a litigant (who asserts the existence of a marriage) as to facts which if true, demonstrate that no marriage agreement was entered into." [8]Clack v. Williams,189 S.W. 2d 503, 505 (Civ. App. Tex. 1945). Petitioner's testimony refutes such *86 a mutual agreement. In addition, the evidence presented does not create such an inference. The mutual agreement necessary is one to live together as husband and wife. If there is no meeting of the minds, there can be no marriage. Clack v. Williams,supra. At some point prior to June 23, 1972, Orita did not want to live together with petitioner as husband and wife because she filed for divorce. Although she returned and lived with petitioner prior to the date the divorce was granted, she nonetheless went through with the divorce. How can it be said that a meeting of the minds occurred immediately thereafter? Petitioner and Orita had been married and divorced twice. During the period between the tw marriages, petitioner and Orita *87 lived together for the most part. It would seem that they would have married a third time if the mutual agreement had existed. The facts and circumstances in this case are quite similar to those involved in the two Texas Court cases cited above, and we believe those cases strongly support our conclusion here. [9]
As to petitioner's argument concerning the determination by the Social Security Administration that petitioner and Orita were entitled to benefits as husband and wife, such fact does not establish that *88 petitioner and Orita were husband and wife pursuant to Texas Family Code section 1.91 as of the end of 1972. By 1976 the facts and circumstances may have changed sufficiently that the existence of a common-law marriage might have been established. Furthermore, a determination by the Social Security Administration that petitioner and Orita were husband and wife for purposes of social security benefits does not establish their status for tax purposes. Cf. Loo v. Commissioner,22 T.C. 220 (1954). Guaranty State Bank of Greenville, Tex. v. Commissioner,12 B.T.A. 543, 547 (1928). [10]
Accordingly, we conclude that petitioner was not entitled to file a joint return with Orita for 1972. Farmland
In order to determine petitioner's gain from the sale of his interest in the 831 acres of farmland, it is first necessary to determine petitioner's basis in the property. In this case, resolution of that question requires a determination of how petitioner acquired his interest in the farmland. If, as petitioner contends, he inherited the property subject to an $8,000 *89 lien in favor of his mother from his father, Charles, upon his father's death in 1947, then petitioner's basis in the property would be its fair market value at the date of his father's death. Sec. 1014. If, however, as respondent contends, petitioner did not inherit the property from his father but rather equitably owned the property together with his first wife, Floy Peveler, prior to his father's death with the father merely holding legal title, then petitioner's basis would not be the property's fair market value. Petitioner has the burden of proving that respondent's determination on this issue is in error. We cannot find that petitioner has carried that burden and we decide this issue in favor of respondent. The record evidence indicates that Charles Peveler owned legal title to the entire 831-acre tract at the time of his death in 1947, having acquired the 622-acre tract from petitioner in 1936 and the 209-acre tract from third parties in 1937. However, the provisions of Charles' will and events that occurred after his death indicate that Charles was holding the land in trust for petitioner. Texas law recognizes the ownership of an equitable interest in real property. *90 Hereford Land Company v. Globe Indutries,Inc., 387 S.W. 2d 771, 775 (Civ. App. Tex. 1965). While we have some difficulty understanding why petitioner should have retained an equitable interest in the 622 acres when he conveyed it to his father for what he had in it, we do not know the circumstances under which the conveyance was made, and we believe the terms of Charles' will, events that occurred in the administration of his estate, and petitioner's own actions subsequent to his father's death support a conclusion that petitioner did have an equitable interest in the 622 acres at the time of Charles' death, and hence did not inherit that property from his father. [11]
*91 Petitionr owned the 622-acre tract from 1933 to 1937, and he and his wife lived on it and took care of it. They continued to live on the 831-acre tract after Charles acquired legal title to it in 1937, until 1940. Petitioner built many fences on the property and maintained the place. While we do not know why petitioner conveyed legal title to the property to Charles, it may be as stated in Charles' will that it was "for security purposes only," and that petitioner retained an equitable interest in the property through an agreement with his father. Charles' will seemed to recognize that petitioner owned the property, but Charles wanted to get the $8,000 he had put into the property out before recognizing full title in petitioner. He obviously recognized petitioner's interest in the entire 831 acres because he referred to it as one tract. The fact that the will devised all of Charles' property, real and personal, to his wife, and yet the appraisal of the estate did not list the 831-acre tract, supports this interpretation of the will. Also, the statement in the will with respect to the 831-acre tract did not contain the dispositive language used in other parts of the will--it *92 said that when petitioner paid the $8,000, the property was all his. The statement can most reasonably be construed as a recognition of petitioner's equitable ownership of the property or a direction that petitioner could buy the property for the $8,000. Another event that supports the conclusion that petitioner acquired the property by purchase rather than inheritance was the recitation in Floy's divorce proceeding that she and petitioner had acquired the property with their mutual funds and not by inheritance, and that it was community property. While this might have been a self-serving declaration, petitioner apparently did not dispute it and transferred an undivided one-half interest in the property to Floy in their property settlement agreement. In addition, in petitioner's original income tax return for 1972, he reported his basis as being $4,198. This approximates the amount petitioner paid his sister after their mother died, being about one-half of the $8,000 lien on the property in favor of the mother. In his first and second amended returns for 1972, petitioner reported that he had inherited a one-half interest in the property from his father, having a value (and *93 basis) of $50 per acre and had received the other one-half interest from his mother to which he attributed a basis of $4,000. It was not until he filed his petition in this case that petitioner claimed he had inherited a 100-percent interest in the farmland from his father. While the provisions of Charles' will are somewhat confusing, we interpret the will to mean that Charles intended to devise all of his property, real and personal, and specifically "all my interest in this [the 831-acre tract] property" to his wife. Petitioner, who has the burden of proof, has offered no evidence that would point to any other interpretation of the will. Under this interpretation, if Charles had any interest in the property other than a lien for the amount he had put into it, this interest passed to Charles' wife, O.P., under the will. In 1949 O.P. conveyed the entire 831-acre farmland to petitioner in consideration of a lien note for $8,000 secured by a mortgage. Of course, this transfer would have included not only any interest in the property she inherited from Charles but also any community interest she may have had in the property. Since the consideration was $8,000, this would become *94 petitioner's basis in the property, if his interest was acquired in this manner, [12] and $4,000 of that basis would be allocated to petitioner's wife, Floy. We conclude that petitioner has not carried his burden of proving that his basis in the 831-acre tract sold in 1972 was one-half of the fair market value of the property at the time of his father's death in 1947 nor that respondent erred in allowing as petitioner's basis the amount claimed on his original return for 1972. Having so concluded, we need not address the valuation issue. Decision will be entered for the respondent.
Footnotes
1. The purpose for which the amended return was filed is relevant to resolution of the second issue in this case but not to the question of petitioner's qualification to file a joint income tax return for 1972.↩
2. At the time petitioner bought this tract in 1933 Charles Peveler was an official of the Federal Land Bank and did not want to bid on the property himself.↩
3. Attached to the petition is a typed copy of petitioner's father's will. At the beginning of this copy is a copy of an order entered on Mar. 14, 1949, by R.S. Long, County Judge of Hood County, Tax., stating that he examined the report of the "inventory appraisment [sic↩] and list of claims" of the estate of petitioner's father and that said report was approved and ordered entered of record. Above this order is a notation that petitioner's father had a claim against petitioner for $8,000 as described in the father's will. This claim was not noted on the inventory and appraisement report introduced into evidence. The order and statement at the top of the copy of the will attached to the petition was not on the copy of the will which was received in evidence.
4. Petitioner's sister and her husband were named as grantors in this deed, but they neither signed nor acknowledged it.↩
5. Petitioner asserted in his petition that following his mother's death, he paid his sister the full $8,000, $4,096 in cash and the remainder in stock which he allowed his sister to take from the mother's estate. Evidence of this payment was not introduced.↩
6. The additional basis claimed was justified on the ground that one-half of the farmland was acquired by inheritance rather than by gift. The original return did not state that the land was acquired by gift.↩
7. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise stated.↩
8. Tex. Family Code, sec. 1.92↩ provides that a "declaration of informal marriage shall be executed on a form prescribed * * *." Sec. 1.94 provides for the recording of such declaration and that a declaration so recorded is prima facie evidence of the marriage of the parties. These sections say nothing about the effect of not filing such a declaration so we have given no weight to petitioner's failure to file such a declaration.
9. In Reilly v. Jacobs,536 S.W. 2d 406 (Civ. App. Tex. 1976), and Till v. Till,539 S.W. 2d 381 (Civ. App. Tex. 1976), the appellate courts found the evidence sufficient to support the judgments of the trial courts that common-law marriages had been established. In Reilly the court distinguished Clack v. Williams,189 S.W. 2d 503 (Civ. App. Tex. 1945), on the facts, as we distinguish Reilly here. We also find Till↩ to be distinguishable on its facts. These two cases and the Texas cases we have relied on in this opinion do point up that the status of common-law marriage in Texas is a tenuous matter.
10. Also cf. Woodling v. Commissioner,T.C. Memo. 1976-391↩.
11. The parties have not tried to explain how petitioner acquired an equitable interest in the 209-acre tract; nor have they discussed the fact that Charles' wife probably had a community interest in at least the 209-acre tract and what effect that might have on petitioner's basis. However, if petitioner acquired a one-half interest in the property from his mother for $8,000 (only one-half of which he paid) that would help explain why he claimed a basis of $4,198 on his original return.↩
12. It would have been interesting to see the abstract of title which petitioner had prepared in conjunction with his sale of the property in 1972.↩